# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**PHILLIP G. DUNCAN**                         )
14403 Dormansville Boulevard                  )
Upper Marlboro, MD  20774                     )
                                              )
            Plaintiff,          )
                                              ) Civil Action No.
      v.               ) JURY TRIAL DEMANDED
                                              )
**LORETTA E. LYNCH,**                         )
**U.S. ATTORNEY GENERAL**                     )
**U.S. DEPARTMENT OF JUSTICE**                )
950 Pennsylvania Avenue, NW                   )
Washington, DC 20530-0001                     )
                                              )
            Defendant.          )
_____)

## COMPLAINT

    1.    Phillip G. Duncan brings this action for damages based on the denial of his rights under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* (hereafter "Title VII") and Sections 501 and 505 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794a, as amended, (hereafter the "Rehab Act").  Specifically, the United States Department of Justice, (hereinafter "DOJ," the Agency or "Defendant") subjected Plaintiff Duncan to discrimination, as well as harassment and a hostile work environment, because of his race (African-American) when management officials took away his job duties and responsibilities; transferred his duties to Caucasian co-workers who had less experience than him; gave credit to Caucasian co-workers for his accomplishments; isolated him; incorrectly and unfairly accused him of poor performance; prevented him from attending meetings and performing his job duties; and gave preferential treatment to Caucasian co-workers by giving them increased responsibility in order to promote them and to allow them to advance in their careers to the detriment of Plaintiff.  Defendant further

discriminated against Plaintiff Duncan because of his disability (physical impairment from stroke; stress and anxiety); race and reprisal (prior EEO activity) when it terminated his employment effective February 7, 2016.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 1343(a)(4); 29 U.S.C. § 794a; and 42 U.S.C. § 2000e-5.

3.      Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location of the Agency's principal office, where Plaintiff worked while employed at the Agency and where, upon information and belief, the employment records relevant to the Complaint are located.

## THE PARTIES

4.      Plaintiff Phillip G. Duncan was a Fleet Management Specialist, and later a Program Analyst, GS-301-13/Step 7 with DOJ's Justice Management Division ("JMD"), Facilities and Administrative Services Staff ("FASS").  Mr. Duncan is an African-American male and he has engaged in protected activities against the Agency.  On September 7, 2014, Mr. Duncan suffered a massive stroke caused by the stress of being discriminated against in his workplace which ultimately resulted in his termination from DOJ.

5.      Defendant the U.S. Attorney General, Loretta E. Lynch, is being sued in her official capacity as provided by law based on her executive responsibility for administering the personnel policies of DOJ and her responsibility to enforce and promote equal employment opportunity throughout DOJ.  During the relevant time period, DOJ employed over 500 employees.

6.      Scott Snell, Director, FASS, is not a named defendant in this lawsuit, but is one of the management officials responsible for the discriminatory acts and harassment against Mr. Duncan as set forth in this Complaint.

7.      Randy C. Wilson, Assistant Director, FASS, is not a named defendant in this lawsuit, but is one of the management officials responsible for the discriminatory acts and harassment against Mr. Duncan as set forth in this Complaint.

8.      Evie Sassok, Deputy Assistant Director, FASS, is not a named defendant in this lawsuit, but is one of the management officials responsible for the discriminatory acts and harassment against Mr. Duncan as set forth in this Complaint.

## FACTS

9.      Plaintiff Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

10.     Prior to September 2013, Mr. Duncan served as a Fleet Management Specialist, GS-13-301 for DOJ, FASS.  Mr. Duncan's direct or 1st Line Supervisor was Randy Correa, Deputy Assistant Director, whose race is Asian Pacific Islander.

11.     In that capacity, Mr. Duncan oversaw the Fleet or Transportation Program, the Aviation Program, the shuttle bus service contract, as well as other duties.

12.     For the rating period from July 2012 to September 2013, in particular, Mr. Duncan conducted meetings and training with OBD's Fleet Managers to measure progress toward the requirements of Executive Orders 13514/13423; worked closely with the Offices, Boards, Divisions and Bureaus (OMB) and JMD Management to provide program service support for Fleet Aviation and Fleet vehicles; managed projects and assignments related to Fleet Aviation, vehicles and property management initiatives; assessed progress on OBD's Transportation Environmental

Management Systems to further bureau EMS development; chaired OBD meetings to improve OMB Transportation Management scorecard, 701 waivers, OMB Budget and FAST; directed and guided the ordering of alternative fuel vehicles; coordinated with GSA to replace lease vehicles for the OBDs; conducted fleet training and policy review for Community Relations Services; served as the COR for DOJ shuttle service; and resolved EOUSA credit card billing issues.

13.     During the period from July 2012 to September 2013, Mr. Duncan's replacement of petroleum vehicles with alternative fuel vehicles resulted in DOJ receiving a "Green" score on the OMB's Transportation Management Scorecard.  Further, Mr. Duncan's work as the COR for DOJ shuttle service lead to a cost savings of $100,000 from reducing shuttles and implementing new service times and schedule changes.

14.     In September 2013, Mr. Duncan's job title changed from Fleet Management Specialist to Program Analyst, GS-13-0343. Mr. Duncan's job duties and responsibilities were significantly reduced over time and eventually his Fleet and Aviation Program duties were removed from his purview and assigned to Caucasian co-workers.

15.     Prior to the change in Mr. Duncan's job title, in approximately August 2012, Scott Snell, Director, FASS, Randy C. Wilson, Assistant Director, and Evie Sassock, Deputy Assistant Director, proposed and were considering a realignment of FASS.  The proposed realignment would remove the Fleet Program and the Aviation Program from the management of Randy Correa, Deputy Assistant Director, and those programs would eventually be assigned to Ms. Sassock.

16.     Mr. Snell, Mr. Wilson and Ms. Sassock wanted to ultimately give Ms. Sassock oversight of "Logistics & Policy Management" which would include Logistics Operations, an area that had been managed by Mr. Correa.

17.     Mr. Snell, Mr. Wilson and Ms. Sassock did not consult or confer with Mr. Correa regarding their plan to realign the Fleet and Aviation Program and did not include Mr. Correa in the strategic planning of his own department.

18.     During the process of giving Ms. Sassock oversight of "Logistics & Policy Management," FASS management, including Mr. Snell and Mr. Wilson, were well-aware that Ms. Sassock's staff was primarily Caucasian.

19.     In 2013 or 2014, Mr. Andrew Kelson, Caucasian, was removed from the supervision of Mr. Correa to Ms. Sassock's team.  Mr. Duncan, an African-American, should have been recognized as being part of Ms. Sassock's team because Mr. Duncan, and not Mr. Kelson, was the one who directly performed the Fleet and Aviation Program duties which eventually became subject to Ms. Sassock's purview.

20.     Ms. Sassock and Mr. Wilson also discriminatorily assigned Mr. Duncan's job duties and responsibilities to two (2) other members of her team, namely Mr. Joseph Gerstell and Ms. Jamie Jansen, both of whom are Caucasian.

21.     For example, previously Mr. Duncan was responsible for replacing petroleum vehicles with alternative fuel vehicles which reduced DOJ petroleum consumption by 10%.  This duty was given to Mr. Kelson and Mr. Gerstell and they were also given credit for Mr. Duncan's accomplishments on this project.

22.     Mr. Duncan worked on spearheading the fleet efforts to train Bureaus and OBD on the Federal Automotive Statistical Tool (FAST), a system that provides data for the OMB Transportation Management Scorecard, which measured 701 waivers, the status of Executive Order requirements and updates to the Government-wide Transportation Program.  This resulted in USMS identifying ways to improve its data quality.  This duty was given to Mr. Kelson, Mr.

Gerstell and Ms. Jansen and they were also given credit for Mr. Duncan's accomplishments on this project.

23.    Mr. Duncan was responsible for completing the OBD FAST data report to the Department of Energy.  This duty was given to Mr. Kelson, Mr. Gerstell and Ms. Jansen.

24.    Mr. Duncan was responsible for directing and guiding the activities of Bureaus and OBDs during the ordering of alternative fuel vehicles to assure a quality result for DOJ.  This duty was given to Mr. Kelson, Mr. Gerstell and Ms. Jansen and they were also given credit for Mr. Duncan's accomplishments on this project.

25.    Mr. Duncan was responsible for the review of systems and vehicle orders, such as the GSA Fleet Drive Thru, GSA Rental Program, Vehicle purchases and Fleet Policy.  This duty was given to Mr. Kelson, Mr. Gerstell and Ms. Jansen.

26.    Mr. Duncan was tasked with reviewing the existing shuttle routes for efficiency and budget constraints when JMD personnel were relocated to the 2CON building.  Mr. Duncan reviewed the existing shuttle service contract and determined that cost savings could be accomplished by changing routes and creating a new route, the Brown Line.  The savings were possible because the JMD relocation to the 2CON building meant that staff were not as spread-out throughout the Metropolitan area.  Mr. Duncan reviewed each shuttle route to combine routes where possible and to avoid costly overlap of expenses with existing shuttle routes.  Mr. Duncan met with LMS mangers regularly and received their input to adjust, terminate and modify routes as necessary.  Mr. Duncan was able to successfully achieve a cost savings of approximately $100,000 with the shuttle bus service contract by streamlining the service routes from five buses to three to better serve the customers.  Mr. Duncan created presentations and briefing slides to explain his proposals.  Ms. Sassock and her staff then took-over all the work that Mr. Duncan did

on this project, including his slides and presentations, and she received the credit for the cost-savings plan that Mr. Duncan created.

27.     Mr. Duncan worked on the High-Tier Environmental Management Systems Internal Audit to ensure that the section was in compliance with the Department Policy.  Mr. Correa and Mr. Wilson failed to recognize Mr. Duncan's work on this project.

28.     Mr. Duncan worked on the Aviation Program and managed the service and inventory of aircraft, as well as tracked aircraft travel miles and policy concerning the aircraft.  Mr. Correa and Mr. Wilson failed to recognize Mr. Duncan's work on this project.  Mr. Duncan had trained Mr. Kelson on the Aviation Program and, when FASS management stripped Mr. Duncan of this responsibly, it was given to Mr. Kelson.

29.     In addition to taking away Mr. Duncan's job duties and responsibilities, Ms. Sassock also sought to diminish Mr. Duncan's professional standing.  Ms. Sassock first tried to force Mr. Duncan to sign a document agreeing to relinquish the Fleet Program from his leadership.  Ms. Sassock and Mr. Wilson had already reduced Mr. Duncan's role and given his duties to Caucasian employees.  As such, Mr. Duncan refused to sign the document.

30.     When Ms. Sassock was unable to get Mr. Duncan to sign the statement, her efforts to besmirch his reputation also included documenting concerns about financial ledgers not balancing between the Finance/Budget and FASS offices in an attempt to blame Mr. Duncan for these problems.  In fact, these problems were caused not by Mr. Duncan, but incompatible and outdated programs between GSA and DOJ.  Further, Mr. Duncan received an Excellent rating on his evaluation and these alleged issues had not been previously raised as performance problems.

31.     Ms. Sassock also embarrassed Mr. Duncan professionally by constantly sending emails and reminders to FASS staff that Mr. Duncan was no longer responsible for the Fleet and Aviation Programs and that he was not to respond to any queries regarding his former duties.

32.     Additionally, Ms. Sassock contacted GSA Karl Wolf and had Mr. Duncan removed from the GSA fleet update list and added herself and Mr. Gerstell instead.  The list, maintained by GSA, consists of Government-wide Transportation Program Managers responsible for training, updating and administering program requirements.  The purpose of the list was to inform the recipients of important meetings and changes in the Fleet Program.  Ms. Sassock also would not allow Mr. Duncan to attend any Transportation and Aviation meetings.

33.     Mr. Duncan knew how to do his job and the Fleet and Aviation Programs were satisfactorily managed under his leadership.  Yet, FASS management, including, Mr. Snell, Mr. Wilson and Ms. Sassock, subjected Mr. Duncan to disparate treatment and a hostile work environment because of his race, by removing him from the Fleet and Aviation Programs.

34.     FASS management, including, Mr. Snell, Mr. Wilson and Ms. Sassock, deliberately did not give Mr. Duncan credit for his work.  Instead, they gave Mr. Kelson the recognition Mr. Duncan deserved which eventually resulted in Mr. Kelson receiving a grade increase that was denied to Mr. Duncan for performing similar work.

35.     FASS management, including, Mr. Snell, Mr. Wilson and Ms. Sassock, deliberately gave Ms. Jansen the job duties and responsibilities for the Fleet Program that had been managed by Mr. Duncan.  This eventually resulted in Ms. Jansen receiving a grade increase for performing similar work as Mr. Duncan.

36.     In July or August 2014, Mr. Wilson directed Mr. Correa to task Mr. Duncan with taking an inventory of properties throughout FASS areas of responsibilities.  This project, known

as the "Supply Inventory," involved the inventory and organization of such things as formal portraits, flags, cleaning and organizing the "FASS G: Drive" into a manageable file system for FASS and tracking gifts to the Attorney General for accountability.

37. Mr. Wilson and Mr. Correa were aware that the "FASS G: Drive" had significant problems and the system had not been updated when it was assigned to Mr. Duncan. Thus, the assignment of this project was designed to set Mr. Duncan up for failure because it involved complex and time-consuming technical knowledge of software which previously had not been part of Mr. Duncan's expertise or duties.

38. During the rating period when Mr. Duncan was tasked with the Supply Inventory project, he did not receive any recognition for his work. However, Mr. Wilson received credit for the work that Mr. Duncan did on the Supply Inventory project as part of an award Mr. Wilson received.

39. Mr. Duncan's duties were significantly reduced and discriminatorily reassigned to Caucasian employees. After his Fleet and Aviation Programs were removed, Mr. Duncan was given such assignments as overseeing art work restoration services; DOJ Seal replacement and requests for use of the DOJ Seal; alcohol waivers; renewal of a committee for the Attorney General (FACA), among other lower level responsibilities.

40. Mr. Duncan should have been able to retain his duties in the Fleet Program because he was officially assigned to the "Logistics & Policy Management" team which, at some point in time, was transferred to Ms. Sassock's management. Notably, Mr. Duncan was not impacted by the alleged realignment of the Fleet Program at any time during the period relevant to this Complaint.

41.     As a point of fact, the realignment of Mr. Duncan's duties from "Logistics & Policy Management" to "Personal Property Services" did not officially occur until an SF-50 was issued with an effective date of January 25, 2015.  Thus, from the time Mr. Duncan's job title changed in September 2013, from Fleet Management Specialist to Program Analyst, GS-13-0343, until his forced departure due to a massive stroke in September 2014, FASS management gave him job duties and projects which were not only inconsistent with his role in the Fleet Program, but also not supported by any official personnel action.  FASS management also gave those duties to less qualified Caucasian employees.

42.     Mr. Duncan was further treated unfairly when he was moved to a new office location, the motor pool on New York Avenue.  Mr. Duncan was moved around the office three times until he was finally placed in a corner near the driver's lounge.  Because Mr. Duncan was so close to the driver's lounge, his work and ability to concentrate were hampered by the constant TV noise in the lounge and several drivers who talked loudly.

43.     DOJ subjected Mr. Duncan to disparate treatment and harassment by removing and reducing his job duties and responsibilities.  DOJ also subjected him to discrimination when it reassigned Mr. Kelson to Ms. Sassock when the Fleet Program and the Aviation Program should have been assigned to Mr. Duncan.

44.     FASS Management, including Mr. Snell, Mr. Wilson and Ms. Sassock, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work.

45.     FASS Management, including Mr. Snell, Mr. Wilson and Ms. Sassock, isolated Mr. Duncan, deliberately set him up for failure, did not give him sufficient time to complete his

assignments, and did not give him credit for his work.  Mr. Duncan's Caucasian colleagues were not targeted like Mr. Duncan or treated in this manner.

46.     Several of Mr. Duncan's colleagues and co-workers witnessed this hostile treatment.  These witnesses will be able to confirm that Mr. Duncan was removed from being the Fleet Manager and those duties were given to Ms. Sassock, Mr. Kelson, Mr. Gerstell and Ms. Jansen, all of whom are Caucasian.  They also witnessed that Mr. Snell, Mr. Wilson and Ms. Sassock wanted to promote others to higher grade levels, who were not qualified, and Mr. Duncan's high profile duties with the Fleet Program were transferred so that these employees, namely Ms. Sassock, Mr. Kelson, Mr. Gerstell and Ms. Jansen, could progress in their career at Mr. Duncan's expense.

47.     Many employees observed that Mr. Duncan did not receive credit or attribution for projects that he successfully completed and that he was given menial and degrading tasks.  Others also witnessed that once Mr. Duncan's Fleet duties were removed, FASS Management, including Mr. Snell, Mr. Wilson and Ms. Sassock, started a concerted campaign to discredit Mr. Duncan and to blame him for any problems with the Fleet Program.  This created a hostile environment because Mr. Duncan was being slandered by management to lower grade employees, whom were shown favoritism over Mr. Duncan.

48.     This disparate treatment and harassment harmed Mr. Duncan's professional reputation and career progression.  Mr. Duncan suffered from an extreme amount of stress and anxiety due to the racially hostile work environment.

49.     On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

50.     Mr. Duncan's neurologist, Dr. Jeffrey D. Lewis, determined that the hostile work environment and discrimination were a contributing factor to the stroke that Mr. Duncan had on September 7, 2014.

51.     As a result of the stroke, Mr. Duncan is now paralyzed on his right side and his speech has been affected.

52.     The hostile work environment and discrimination caused Mr. Duncan humiliation, a loss of prestige and made his working conditions intolerable.  Mr. Duncan was unable to return to work following his stroke on September 7, 2014.  But for the hostile work environment at FASS, Mr. Duncan would not have had a stroke and been subsequently removed from his position effective on February 7, 2016.

53.     The harassment and hostile work environment created by FASS Management, including Mr. Snell, Mr. Wilson and Ms. Sassock fostered a highly unprofessional workplace atmosphere.  None of the Caucasian employees supervised by Ms. Sassock were disparaged or treated unfairly like Mr. Duncan.  The constant and baseless criticisms, remarks, rebukes and diminishment of job duties negatively impacted Mr. Duncan's employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.

54.     The unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, have caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  As a direct and proximate result of this harassment and discrimination, Mr. Duncan has suffered harm including, but not limited to, loss of substantial past and future salary, awards, benefits and

entitlements, loss of professional status, career-enhancing and advancement opportunities and loss of retirement and other employment benefits and privileges.

## EXHAUSTION OF REMEDIES

55.     Mr. Duncan has exhausted all administrative requirements that apply to the processing of his complaint, including the filing of an informal and a formal complaint with the EEO office and a request for the issuance of a Final Agency Decision.

## STATEMENT OF CLAIMS

**COUNT I:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*
Hostile Work Environment and Harassment Based on Race .**

56.     Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

57.     Title VII prohibits federal agencies from creating a hostile work environment or engaging in harassment against its employees because of race.  Mr. Duncan is an African-American male.

58.     Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under Title VII.

59.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, harassed Mr. Duncan and created a hostile work environment by making constant and baseless criticisms, remarks, rebukes and diminishment of job duties that negatively impacted Mr. Duncan's employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.  The harassment made Mr. Duncan's work environment intolerable and hostile.

60.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

61.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work.

62.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, isolated Mr. Duncan, deliberately set him up for failure, did not give him sufficient time to complete his assignments, and did not give him credit for his work.  Mr. Duncan's Caucasian colleagues were not targeted like Mr. Duncan or treated in this manner.

63.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, Mr. Duncan has suffered from emotional distress from being harassed and subjected to a hostile work environment because of his race.  On September 7, 2014, Mr. Duncan had a massive stroke. The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

64.     The unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing

and advancement opportunities as a result of being harassed and subjected to a hostile work environment because of his race.

65.      As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT II:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*
Discrimination Based on Race/Terms and Conditions of Employment.**

66.      Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

67.      Title VII prohibits federal agencies from discriminating against its employees in the terms, conditions and privileges of employment because of race.  Mr. Duncan is an African-American male.

68.      Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under Title VII.

69.      DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, discriminated against Mr. Duncan by making constant and baseless criticisms, remarks, rebukes and diminishment of job duties that negatively impacted Mr. Duncan's employment; unfairly interfered with his ability to perform his job; and made it more difficult for him to carry out his duties, all of which damaged and hampered his career.

70.      DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

71.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, discriminated against Mr. Duncan by giving his job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work.

72.     DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, isolated Mr. Duncan, discriminated against Mr. Duncan by deliberately setting him up for failure, not giving him sufficient time to complete his assignments, and not giving him credit for his work.  Mr. Duncan's Caucasian colleagues were not targeted like Mr. Duncan or treated in this manner.

73.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, Mr. Duncan has suffered from emotional distress from being discriminated against in the terms, conditions and privileges of employment because of his race.  On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by being discriminated against because of race.

74.     The unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being discriminated against in the terms, conditions and privileges of employment because of his race.

75.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, including Mr. Snell, Mr. Wilson and Ms. Sassock among others,

Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT III:   Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e _et seq._ Discrimination Based on Race/Termination of Employment.**

76.     Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

77.     Title VII prohibits federal agencies from terminating its employees because of race. Mr. Duncan is an African-American male.

78.     Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under Title VII.

79.     DOJ and/or agents or employees acting on its behalf, subjected Mr. Duncan to disparate treatment and harassment by removing and reducing his job duties and responsibilities.

80.     DOJ and/or agents or employees acting on its behalf, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work

81.     DOJ and/or agents or employees acting on its behalf, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

82.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan suffered from extreme emotional distress from being discriminated against and harassed.

83.     On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

84.     Mr. Duncan's neurologist, Dr. Jeffrey D. Lewis, determined that the hostile work environment and discrimination were a contributing factor to the stroke that Mr. Duncan had on September 7, 2014.

85.     As a result of the stroke, Mr. Duncan is now paralyzed on his right side and his speech has been affected.

86.     Mr. Duncan was unable to return to work following his stroke on September 7, 2014.  But for the hostile work environment at FASS, Mr. Duncan would not have had a stroke and been subsequently removed from his position effective on February 7, 2016.

87.     DOJ and/or agents or employees acting on its behalf, terminated Mr. Duncan because of his race.

88.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan has suffered and continues to suffer injury and harm including, but not limited to, loss of substantial past and future salary; awards, benefits, entitlements, and other privileges of employment; loss of professional status, career-enhancing and advancement opportunities; and other past and future pecuniary losses.

89.     The unlawful acts of DOJ and/or agents or employees acting on its behalf, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being discriminated against in the terms, conditions and privileges of employment because of his race.

90.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT IV:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* Retaliation Based on Previous Protected Activity/Termination of Employment.**

91.     Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

92.     Title VII prohibits federal agencies from terminating its employees because they engaged in protected activities (reprisal/retaliation).

93.     Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under Title VII

94.     Mr. Duncan engaged in protected activities by filing an EEO complaint on or about August 13, 2014.

95.     DOJ and/or agents or employees acting on its behalf, subjected Mr. Duncan to disparate treatment and harassment by removing and reducing his job duties and responsibilities.

96.     DOJ and/or agents or employees acting on its behalf, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work

97.     DOJ and/or agents or employees acting on its behalf, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

98.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan suffered from extreme emotional distress from being discriminated against and harassed.

99.     On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

100.    Mr. Duncan's neurologist, Dr. Jeffrey D. Lewis, determined that the hostile work environment and discrimination were a contributing factor to the stroke that Mr. Duncan had on September 7, 2014.

101.    As a result of the stroke, Mr. Duncan is now paralyzed on his right side and his speech has been affected.

102.    Mr. Duncan was unable to return to work following his stroke on September 7, 2014.  But for the hostile work environment at FASS, Mr. Duncan would not have had a stroke and been subsequently removed from his position effective on February 7, 2016.

103.    DOJ and/or agents or employees acting on its behalf, retaliated against Mr. Duncan by terminating his employment.

104.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan has suffered and continues to suffer injury and harm including, but not limited to, loss of substantial past and future salary; awards, benefits, entitlements, and other privileges of employment; loss of professional status, career-enhancing and advancement opportunities; and other past and future pecuniary losses.

105.    The unlawful acts of DOJ and/or agents or employees acting on its behalf, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being retaliated against for engaging in protected activities.

106.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

**COUNT V:  Violation of Rehabilitation Act of 1973, As Amended**
**Discrimination Based on Disability or Perceived Disability/Termination of Employment**

107.    Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

108.    The Rehab Act prohibits federal agencies from discriminating against its employees because of a disability.

109.    Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under the Rehab Act.

110.    Mr. Duncan is disabled and paralyzed on his right side as a result of a massive stroke.  Mr. Duncan is limited in the major life activities of walking, speech, and paralysis of his right side.

111.    DOJ and/or agents or employees acting on its behalf, subjected Mr. Duncan to disparate treatment and harassment by removing and reducing his job duties and responsibilities.

112.    DOJ and/or agents or employees acting on its behalf, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work

113.    DOJ and/or agents or employees acting on its behalf, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

114.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan suffered from extreme emotional distress from being discriminated against and harassed.

115.    On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

116.     Mr. Duncan's neurologist, Dr. Jeffrey D. Lewis, determined that the hostile work environment and discrimination were a contributing factor to the stroke that Mr. Duncan had on September 7, 2014.

117.     As a result of the stroke, Mr. Duncan is now paralyzed on his right side and his speech has been affected.

118.     Mr. Duncan was unable to return to work following his stroke on September 7, 2014.  But for the hostile work environment at FASS, Mr. Duncan would not have had a stroke and been subsequently removed from his position effective on February 7, 2016.

119.     DOJ and/or agents or employees acting on its behalf, discriminated against Mr. Duncan because of his disability/perceived disability by terminating his employment.

120.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan has suffered and continues to suffer injury and harm including, but not limited to, loss of substantial past and future salary; awards, benefits, entitlements, and other privileges of employment; loss of professional status, career-enhancing and advancement opportunities; and other past and future pecuniary losses.

121.     The unlawful acts of DOJ and/or agents or employees acting on its behalf, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional status, career-enhancing and advancement opportunities as a result of being discriminated against in the terms, conditions and privileges of employment because of his disability/perceived disability.

122.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

### COUNT VI:  Violation of Rehabilitation Act of 1973, As Amended
### Failure to Accommodate a Disability /Termination of Employment

123.    Mr. Duncan adopts and incorporates by reference all averments in the foregoing paragraphs.

124.    The Rehab Act requires that federal agencies provide a reasonable accommodation to employees with a disability so that they can continue working and be employed.

125.    Defendant, DOJ, was, at all times relevant to this matter, the employer of Mr. Duncan for all purposes under the Rehab Act.

126.    Mr. Duncan is disabled and paralyzed on his right side as a result of a massive stroke.  Mr. Duncan is limited in the major life activities of walking, speech, and paralysis of his right side.

127.    DOJ and/or agents or employees acting on its behalf, subjected Mr. Duncan to disparate treatment and harassment by removing and reducing his job duties and responsibilities.

128.    DOJ and/or agents or employees acting on its behalf, gave Mr. Duncan's job duties to Caucasian colleagues, namely Mr. Kelson, Mr. Gerstell and Ms. Jansen, and also allowed them to take credit for Mr. Duncan's work.

129.    DOJ and/or agents or employees acting on its behalf, treated Mr. Duncan differently and less favorably than other white and female peers and co-workers.

130.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan suffered from extreme emotional distress from being discriminated against and harassed.

131.    On September 7, 2014, Mr. Duncan had a massive stroke.  The stroke was the direct result of the significant stress and anxiety caused by the workplace discrimination and harassment.

132.    Mr. Duncan's neurologist, Dr. Jeffrey D. Lewis, determined that the hostile work environment and discrimination were a contributing factor to the stroke that Mr. Duncan had on September 7, 2014.

133.    As a result of the stroke, Mr. Duncan is now paralyzed on his right side and his speech has been affected.

134.    Mr. Duncan was unable to return to work following his stroke on September 7, 2014.  But for the hostile work environment at FASS, Mr. Duncan would not have had a stroke and been subsequently removed from his position effective on February 7, 2016.

135.    DOJ and/or agents or employees acting on its behalf, failed to accommodate Mr. Duncan's disability by allowing him to take additional leave and/or determining if alternative employment, such as telework, could have been offered to Mr. Duncan.  Instead of providing Mr. Duncan with an accommodation that would have allowed him to continue his employment, DOJ and/or agents or employees acting on its behalf, terminated his employment.

136.    As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Mr. Duncan has suffered and continues to suffer injury and harm including, but not limited to, loss of substantial past and future salary; awards, benefits, entitlements, and other privileges of employment; loss of professional status, career-enhancing and advancement opportunities; and other past and future pecuniary losses.

137.    The unlawful acts of DOJ and/or agents or employees acting on its behalf, have further caused Mr. Duncan embarrassment, humiliation and indignity, as well as damage to his professional reputation and career.  This harm includes, but is not limited to, a loss of professional

status, career-enhancing and advancement opportunities as a result of being discriminated against in the terms, conditions and privileges of employment because of his disability.

138.     As a direct and proximate result of the unlawful acts of DOJ and/or agents or employees acting on its behalf, Defendant is additionally liable to Mr. Duncan for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

## RELIEF SOUGHT

**WHEREFORE**, Mr. Duncan requests that this Court award damages against Defendant and respectfully requests the Court to:

A.     Enter judgment for Plaintiff against Defendant on all Counts;

B.     Declare that Defendant subjected Plaintiff to harassment and a hostile work environment because of his race;

C.     Declare that Defendant subjected Plaintiff to discrimination because of his race in the terms, conditions and privileges of employment;

D.     Declare that Defendant terminated Plaintiff because of his race;

E.     Declare that Defendant terminated Plaintiff in reprisal for engaging in protected activities;

F.     Declare that Defendant terminated Plaintiff because of his disability/perceived disability;

G.     Declare that Defendant failed to provide Plaintiff with a reasonable accommodation for his disability;

H.     Award Mr. Duncan full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, cash awards, loss of retirement savings and benefits, and other remuneration and privileges of employment retroactive

to the date of any unlawful action found to have occurred in this case;

     I.    Award Mr. Duncan compensatory damages for the emotional distress injuries and losses that he suffered in an amount to be proved at trial;

     J.    Award Mr. Duncan pecuniary and out of pocket expenses;

     K.    Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses Mr. Duncan has and will incur as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and,

     L.    Order such other equitable and legal relief as the Court deems necessary and appropriate to make Mr. Duncan whole.

## JURY DEMAND

Plaintiff requests a trial by a jury as to all claims set forth in this Complaint.

Respectfully submitted,

 /s/ Camilla C. McKinney
Camilla C. McKinney, Esq.
D.C. Bar No. 448776
McKinney & Associates, PLLC
1250 Connecticut Avenue, NW, Suite 200
Washington, DC  20036
(202) 470-0935 (telephone)
(877) 590-4777 (facsimile)
CMcKinney@DCEmploymentLawyer.com
*Attorneys for Plaintiff Phillip G. Duncan*